## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO
Bankruptcy Judge Thomas B. McNamara

| | |
|---|---|
| In re:<br><br> JEFFREY ALLAN MASCIO,<br><br>Debtor. | Bankruptcy Case No. 25-10631 TBM<br>Chapter 7 |
| PETER AND SUZANNE GRAHAM,<br><br>Plaintiffs,<br><br>v.<br><br>JEFFREY ALLAN MASCIO,<br><br>Defendant. | Adv. Pro. No. 25-1157 TBM |

## ORDER DENYING MOTION TO DISMISS

### I.   Introduction.

Peter and Suzanne Graham (the "Grahams") are the holders of a final judgment issued by a Washington State Court (the "Judgment") in the face amount of $1,500,000.00 against Jeffrey Mascio (the "Debtor" or "Mr. Mascio") for securities fraud. The Judgment entered on June 14, 2017, the Debtor appealed the Judgment and the Washington Court of Appeals affirmed the Judgment. Mr. Mascio did not further appeal the affirmance.  The Grahams engaged in extensive collection efforts to no avail.  They assert that Mr. Mascio has gone to great lengths to frustrate the Grahams' collection efforts, including by concealing assets and transferring his income and assets to an offshore trust, the "JG Family Trust" or the "Cook Island Trust" (the "Trust").

The Grahams' collection efforts have been further stymied by the Debtor's filing for bankruptcy protection under Chapter 7 of the Bankruptcy Code,[1] first on June 24, 2024, *In re Mascio*, 24-13493 TBM (Bankr. D. Colo) (the "First Case"), and again on the filing of this Chapter 7 case on February 5, 2024 in the main bankruptcy case captioned: *In re Jeffrey Allan Mascio*, Case. No. 25-10631 TBM (Bankr. D. Colo.) (the "Main

---

[1]     All references to the "Bankruptcy Code" are to the United States Bankruptcy Code, 11 U.S.C. § 101 et seq.  Unless otherwise indicated, all references to "Section" are to sections of the Bankruptcy Code.

Case").  The Court dismissed the Debtor's First Case on August 9, 2024 pursuant to Section 521(i) for the Debtor's failure to file the documents required by Section 521(a). (First Case Docket No. 19.) [2]

Subsequently, on May 8, 2025. the Grahams commenced this Adversary Proceeding, *Peter and Suzanne Graham v. Jeffrey Allan Mascio (In re Mascio)*, Adv. Pro. No. 25-1157 TBM (Bankr D. Colo.) (the "Adversary Proceeding"), by filing a "Complaint for Denial of Discharge and/or Determination that Debt is Not Dischargeable."  (Docket No. 1, the "Complaint.")  Through the Complaint, the Grahams object to the Debtor's bankruptcy discharge under Sections 727(a)(2), (a)(3), (a)(4) and (a)(5).  Additionally, the Plaintiffs request a declaration that the debt set forth in the Judgment is nondischargeable pursuant to Sections 523(a)(2), (4) and (6).

Rather than filing an answer to the Complaint, the Debtor, apparently acting on a *pro se* basis,[3] filed his "Combined Motion to Dismiss Adversary Complaint and to Strike Filings by Unauthorized Attorney."  (Docket No. 6, the "Motion to Dismiss" and "Motion to Strike.")  The Grahams filed an "Opposition to Defendant's Combined Motion to Dismiss and Motion to Strike"  (Docket No. 7, the "Opposition.")  On June 20, 2025, the Debtor submitted his "Reply in Support of Combined Motion to Dismiss and to Strike." (Docket No. 8, the "Reply.")  For the reasons set forth below, the Court denies the Motion to Dismiss.

## II.   <u>Jurisdiction and Venue.</u>

The Court has subject matter jurisdiction over this Adversary Proceeding concerning the Debtor's entitlement to a discharge and the dischargeability of a particular debt pursuant to 28 U.S.C. § 1334.  This dispute is a core proceeding under 28 U.S.C. §§ 157(b)(2)(B), (b)(2)(I) and (b)(2)(J), because it seeks a determination as to the dischargeability of a particular debt and a challenge to the Debtor's entitlement to a discharge.  Venue is proper in this Court under 28 U.S.C. §§ 1408 and 1409.

---

[2]     The Court will refer to documents filed in the CM/ECF docket for this Adversary Proceeding, using the convention: "Docket No. ____ ."  When referring to a document filed in either the First Case or the Debtor's Main Case, the Court will use the convention: "First Case Docket No.____" or "Main Case Docket No.____".

[3]     The Debtor purports to be unrepresented by counsel in this Adversary Case although he has legal counsel in the Main Case.  "The court, therefore, 'review[s] h[is] pleadings and other papers liberally and hold[s] them to a less stringent standard than those drafted by attorneys.'" *Heath v. Root9B*, 2019 WL 1045668, at *2 (D. Colo. Mar. 4, 2019) (quoting *Trackwell v. United States*, 472 F.3d 1242, 1243 (10th Cir. 2007) (citations omitted)).  *See also, Thompson v. Coulter*, 680 Fed. Appx. 707, 710 (10th Cir. 2017); *Garrett v. Selby Connor Maddux & Janer*, 425 F.3d 836, 840 (10th Cir. 2005)); *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).  However, the Court "'cannot take on the responsibility of serving as the litigant's attorney in constructing arguments' or the 'role of advocate' for a pro se plaintiff." *Root9B*, 2019 WL 1045668 at *3 (quoting *Garrett*, 425 F.3d at 840).  The pro se plaintiff is required to follow the same rules of procedure that other litigants must abide by.  *Garrett*, 425 F.3d at 840 (quoting *Nielsen v. Price*, 17 F.3d 1276, 1277 (10th Cir. 1994)).  Given the complexity of bankruptcy litigation, the Court encourages the Debtor to retain legal counsel.

### III.    Procedural Background.

The Grahams filed their Complaint seeking to deny the Debtor his discharge overall and/or in the alternative, to except from any discharge the Debtor may receive, their debt represented by the Judgment.  The Grahams assert that: the Debtor has attempted to shield his assets from collection by the Grahams (using a variety of illegal schemes); he has openly admitted that the purpose of the Trust is to insulate assets from creditors, particularly the Grahams; he has failed to disclose assets on his bankruptcy filings; there are unexplained inconsistencies between the Schedules the Debtor filed in his First Case and in the Main Case; and he has made false oaths in his Schedules.  The Grahams rely heavily on the factual findings of fraud, including false and fraudulent representations, which the Washington State Court stated in the Judgment.  The Grahams do so in support of both their objections to the Debtor's discharge and their Claims for Relief under Section 523(a)(2), (a)(4) and (a)(6).

Although the Judgment is not attached to the Complaint, it is integral to the Complaint.  The Debtor does not dispute the fact that the Washington State Court entered the Judgment or that the Washington Court of Appeals affirmed the Judgment. See Motion to Dismiss at 3 and Reply at 3-6.

In the Motion to Dismiss, the Debtor argues that: (1) the Plaintiffs' counsel is not authorized to practice in the United States District Court for the District of Colorado (the "District Court").  As such, he asserts that counsel cannot practice in this Court and his filings should be stricken.  Then, the Debtor contends that Complaint should be dismissed for failure to state a claim under Fed. R. Civ. P. 12(b)(6) as made applicable to this Adversary Proceeding by Fed. R. Bankr. P. 7012, because: (1) the Judgment "is dormant and unenforceable"; (2) the Judgment "may not be a basis for a nondischargeability action [under Section 523(a)(2), (4), and (6)] where no new fraud or willful conduct is pled;" and (3) the Grahams have failed to plead specific facts showing the Debtor's fraudulent intent or concealment of assets.  The Debtor alleges: "Plaintiffs rely on conclusory allegations regarding a valid offshore trust and fail to allege specific misconduct or concealment within one year of the bankruptcy filing."  Motion to Dismiss at 2.  As part of his conclusory challenges, the Debtor tosses in an undeveloped argument that the Complaint does not meet the pleading requirements of Fed. R. Civ. P. 9(b) to plead fraud with specificity.  The issues raised by the Motion to Dismiss, the Opposition and the Reply are fully briefed and ripe for adjudication.

### IV.    Legal Standards for Motions to Dismiss.

The Motion to Dismiss states that it is made pursuant to Federal Rules of Civil Procedure 12 (b)(6), as made applicable by Federal Rule of Bankruptcy Procedure 7012.  The Defendant also moves to strike all filings submitted by Plaintiffs' attorney R. Omar Riojas, who he erroneously contends is not admitted to practice before the U.S. District Court of the District of Colorado. Motion to Dismiss at 1.  The Debtor also alludes to Fed. R. Civ. P. 9(b).  The Motion to Dismiss is far from a model of clarity.

3

A.  **Law Applicable to Motions to Dismiss Under Fed. R. Civ. P. 12(b)(6)**.

Fed. R. Civ. P. 12(b)(6) provides:

> (b)  Every defense to a claim for relief in any pleading must be asserted in the responsive pleading if one is required. But a party may assert the following defenses by motion . . .
>
> (6) failure to state a claim upon which relief can be granted.

When considering a motion to dismiss under Fed R. Civ. P. 12(b)(6), the Court must accept as true all well-pleaded factual allegations in a complaint and view them in the light most favorable to the plaintiff.  *Burnett v. Mortg. Elec. Registration Sys., Inc.*, 706 F.3d 1231, 1235 (10th Cir. 2013).  A complaint will be dismissed unless it "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

A claim is considered "plausible" when the complaint contains facts which allow the Court "to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  "Plausible" does not mean "probable", although the plaintiff must show that its entitlement to relief is more than speculative.  *See id.* ("Determining whether a complaint states a plausible claim for relief will. . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'");  *Twombly*, 550 U.S. at 556 ("Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement").  If the allegations in a complaint "are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs 'have not nudged their claims across the line from conceivable to plausible.'"  *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1215 (10th Cir. 2011) (citation omitted).  Put another way, "the complaint must give the Court reason to believe that *this* plaintiff has a reasonable likelihood of mustering factual support for *these* claims."  *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (emphasis in original).

The Court is bound to accept well-pleaded factual allegations as true but will not give deference to legal conclusions.  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Iqbal*, 556 U.S. at 678.  Legal conclusions must be supported by well-pleaded factual allegations, which can be assumed as true and evaluated as to whether they plausibly give rise to the requested relief.  *Id.* at 679.  This process is "a context-specific task" which depends on the elements of a particular claim and requires the Court "to draw upon its judicial

4

experience and common sense." *Burnett*, 706 F.3d at 1236 (quoting *Iqbal*, 556 U.S. at 679). Careful evaluation is necessary to ensure that defendants are sufficiently able to prepare their defenses and avoid facially groundless litigation.

Ultimately, the critical question is: "assum[ing] the truth of all well-pleaded facts . . . and draw[ing] all reasonable inferences therefrom in the light most favorable to the plaintiffs," whether the complaint "raise[s] a right to relief above the speculative level.'" *Dias v. City & County of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009) (quoting *Twombly*, 550 U.S. at 555). It is a very low threshold. "[G]ranting [a] motion to dismiss is a harsh remedy which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but also to protect the interests of justice." *Dias*, 567 F.3d at 1178 (quoting *Duran v. Carris,* 238 F.3d 1268, 1270 (10th Cir. 2001)) (brackets in original). Thus, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" *Twombly*, 550 U.S. at 556 (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 236, (1974)).

Notably, a motion to dismiss under Fed. R. Civ. P. 12(b)(6) is not a mechanism to dispute the facts. *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 757 F.3d 1125, 1135 (10th Cir. 2014) ("The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's amended complaint alone is legally sufficient to state a claim for which relief may be granted."). Accordingly, when ruling on a Fed. R. Civ. P. 12(b)(6) motion to dismiss, the Court "must examine only the plaintiff's complaint [and] must determine if the complaint alone is sufficient to state a claim." *Jackson v. Integra, Inc.*, 952 F.2d 1260, 1261 (10th Cir. 1991); *see also Dean Witter Reynolds, Inc. v. Howsam*, 261 F.3d 956, 961 (10th Cir. 2001) (generally, it is "unacceptable for a court" to look "beyond the four corners of the complaint" when deciding a "Rule 12(b)(6) motion to dismiss"); *Miller v. Glanz*, 948 F.2d 1562, 1565 (10th Cir. 1991) (same). The Court "cannot review matters outside of the complaint." *Integra*, 952 F.2d at 1261.

**B.    Law Applicable to Motions to Dismiss Under Fed. R. Civ. P. 9(b).**

A party asserting a claim for fraud is subject to the heightened pleading requirements of Fed. R. Civ. P. 9(b) (as incorporated by Fed. R. Bankr. P. 7009). *See Wagner v. Cunningham (In re Vaughan Co., Realtors*), 481 B.R. 752, 757 (Bankr. D. N.M. 2012) (party asserting claim under Section 548(a)(1)(A) must plead fraud under the 9(b) heightened pleading standard); *Tronox, Inc. v. Anadarko Petroleum Corp. (In re Tronox, Inc.)*, 429 B.R. 73, 92 (Bankr. S.D.N.Y. 2010), (allegations of fraud must be pled with particularity under Rule 9(b) and such requirement protects "the defending party's reputation, discourage[s] meritless accusations, and provide[s] detailed notice of fraud claims to defending parties"); *Picard v. Cohmad Sec. Corp. (In re Bernard L. Madoff Inv. Sec. LLC)*, 454 B.R. 317, 329 (Bankr. S.D.N.Y. 2011) (actual fraudulent transfer claims must meet the heightened pleading requirements of Rule 9(b) whether brought under the Bankruptcy Code or applicable New York fraudulent transfer law. Under Rule 9(b), a party alleging fraud "must state with particularity the circumstances constituting fraud

. . . [though] [m]alice, intent, knowledge and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

As the Tenth Circuit has explained it:

> [C]laims comply with Rule 9(b) when they "provid[e] factual allegations regarding the who, what, when, where and how of the alleged claims." . . . But, "in determining whether a plaintiff has satisfied Rule 9(b), courts may consider whether any pleading deficiencies resulted from the plaintiff's inability to obtain information in the defendant's exclusive control." . . . This reflects the principle that "Rule 9(b) does not require omniscience; rather the Rule requires that the circumstances of the fraud be pled with enough specificity to put defendants on notice as to the nature of the claim."

*U.S. ex rel. Polukoff v. St. Mark's Hosp.*, 895 F.3d 730, 745 (10th Cir. 2018) (internal citations omitted).

## V.   Factual Allegations in the Complaint.

Based upon the foregoing legal standards, the focus of the Court's inquiry for the Motion to Dismiss is on the "well-pleaded facts" alleged in the Complaint. The Court notes that the Judgment is central to the Complaint and the Debtor does not dispute the fact of the Judgment.  The Debtor only challenges the enforceability and the preclusive effect of the Judgment, neither of which is the proper subject of a motion to dismiss under Rule 12(b)(6).  The Complaint asserts, among other things, the following facts which the Court quotes verbatim as they are recited in the Complaint:

> 7.      In a Washington state court proceeding, which resulted in a Judgment of the King County Superior Court ("Judgment") and an opinion of the Washington State Court of Appeals affirming the Judgment (*Graham v. Mascio*, 6 Wn. App. 2d 1028, at *1 (2018) ("Court of Appeals Opinion")), Mascio was found to have engaged in securities fraud with respect to the Grahams.  The pertinent facts underlying the Judgment and Court of Appeals Opinion are set forth below.

> 8.      The Grahams had previously established an investment account with a firm called Carina Wealth Management ("Carina").  The Grahams' financial objectives included retirement savings, paying for their children's education, and providing support for aging parents. Consistent with these investment objectives, Plaintiffs worked with Carina to develop an investment portfolio consisting of mainstream, moderate-risk assets such as blue-chip stocks.

6

9.      In 2010, Meridian Capital Management ("Meridian"), a company owned and operated by Mascio, acquired Carina and assumed control over Plaintiffs' investment account.

10.     Plaintiffs repeatedly and clearly communicated their desire that Mascio/Meridian pursue a prudent investment strategy. Indeed, "Meridian identified the Grahams' short-term investment risk tolerance to be 'moderate.'" Court of Appeals Opinion, at *1. Moreover, Mascio expressly assured the Grahams that he intended to avoid taking excessive risks, including saying to Plaintiffs that "[t]he first step in making you money is not losing your money."

11.     In 2015, Mascio/Meridian requested that Plaintiffs open a new account with a brokerage firm called Interactive Brokers, which included functionality for various exotic, speculative and high-risk transactions, and for which Mascio/Meridian would have trading authority.  Plaintiffs expressed concern and reiterated their aversion to such high-risk investments, with Mr. Graham stating: "I'd just like [to] make sure we're not going to be jumping into a bunch of speculative or highly leveraged trading that I don't have a good understanding of. Please confirm." Court of Appeals Opinion, at *1.  In response, Mascio stated in an email:

> All of the disclosure[s] are to give you access to the full capabilities of [Interactive Brokers]. These include international Exchanges such as China and Europe, FOREX, Futures, options on futures, [etc]. <u>We will most likely</u> never access the full spectrum of capabilities and ***will not be venturing into high risk high speculation markets.***

*Id*. at *2 (underline in Court of Appeals Opinion; boldface/italics added).  In reliance on Mascio's assurances, Plaintiffs authorized opening the Interactive Brokers account.

12.     However, as the Washington State Courts later concluded, Mascio's statements to Plaintiffs were false and fraudulent.  Indeed, at time he wrote the above statement, Mascio in fact intended to engage in exceedingly risky transactions with Plaintiffs' life savings, in order to obtain performance-based compensation for himself.

7

13.     Contrary to the assurances he gave Plaintiffs, Mascio began making trades with the Grahams' account involving a securities derivative called "VXX." VXX is an "exchange-traded note" intended to track a separate measure of market volatility called VIX, which is itself generated by algorithms based on movements in stock options prices. "VXX is highly volatile and unpredictable, posing tremendous risk." Court of Appeals Opinion, at *2.

14.     Plaintiffs learned that Mascio was trading in VXX, and expressly instructed him to stop doing do.

15.     Mascio ignored Plaintiffs' instructions and, in August 2015, used Plaintiffs' investment funds to engage in an enormous, highly leveraged, and ultimately disastrous transaction in VXX. As the Court of Appeals explained:

> Meridian engaged in a strategy known as a "synthetic short" of VXX in the Grahams' accounts. This purchase and sale strategy is effectively a bet that the value of the underlying asset, the VXX security, will decrease.
>
> The VXX short maneuver turned out to be a very bad bet. The value of VXX increased, rather than decreased. Because Meridian had placed the bet "on margin," essentially borrowing money from Interactive Brokers to fund the VXX purchases, when the Grahams began losing money, Interactive Brokers' margin requirements led to the automatic sale of securities in the Grahams' account to pay off the debt owed to Interactive Brokers. As a result, between August 21 and 25, 2015, the Grahams lost over $1 million.

Court of Appeals Opinion, at *2.

16.     Plaintiffs filed a lawsuit against Mascio and Meridian in King County, Washington, Superior Court, asserting (*inter alia*) claims under the Washington State Securities Act ("WSSA").

17.     Plaintiffs propounded Requests for Admissions to Mascio and Meridian, which (due to their failure to answer) were deemed admitted by the Superior Court. Mascio conclusively admitted, *inter alia*, that:

8

• "[Y]ou were an investment advisor to the Plaintiffs."

• "Plaintiffs did not authorize you to make transactions involving VXX."

• "Peter Graham specifically told you not to make further transactions involving VXX."

• "[Y]ou told the Plaintiffs, 'The first step in making you money is not losing your money.'"

• "[I]n an email to the Plaintiffs on May 27, 2015, you stated: 'We will most likely never access the full spectrum of capabilities and will not be venturing into high risk high speculation markets.'"

• "[T]he transactions with regard to VXX are high risk high speculation markets."

• "[A]t the time you wrote the May 27, 2015 email you intended to engage Plaintiffs' investment assets in high risk high speculation markets."

• "[T]he VXX Transactions (as defined in the Complaint) were motivated by a desire to earn performance-based income for yourself."

• "[A]s a direct result of the VXX Transactions (as defined in the Complaint), the Plaintiffs' investment portfolio lost cash value of at least $1,070,915.40."

18.     Based on these admissions as well as other unrebutted evidence, the Superior Court granted summary judgment to Plaintiffs on their WSSA claim.

19.     On June 14, 2017, the Superior Court entered the Judgment against Mascio and Meridian in the amount of $1,513,426.83 (which amount included principal, pre-judgment interest, costs and attorneys' fees). The Judgment continues to accrue post- judgment interest at a rate of 12% per annum.

20.     Mascio and Meridian appealed the Judgment. The Washington Court of Appeals affirmed. Dispositively here, the Court of Appeals concluded that the gravamen of the Judgment was that Mascio had violated . . . WSSA securities

fraud [law] . . . .  As the Court of Appeals concluded, the Superior Court had properly found (including based on Mascio and Meridian's binding admissions) that Mascio and Meridian committed fraudulent acts in violation of RCW 21.20.010:

> **The Grahams presented undisputed evidence that on May 27, 2015, Mascio represented to Peter Graham that he and Meridian would not be "venturing into high risk[,] high speculation markets," but on the day he made this representation, he intended to do the exact opposite.** Meridian and Mascio admitted the Grahams had not authorized Mascio to make the VXX transactions, the transactions were not suitable securities transactions for them, and the VXX short sales were high risk, high speculation trades, which exposed the Grahams' investment portfolio to unlimited risk. Meridian and Mascio admitted the Grahams had instructed Mascio that preserving investment capital was a top priority.

> Meridian argued below and on appeal that the terms of the 2015 agreement provided Mascio with the contractual authorization to engage in the risky, speculative trades. But according to Peter Graham's undisputed testimony, **the 2015 agreement permitted trading in riskier and more exotic securities than he and his wife were comfortable with, and he sought confirmation that Mascio would not be engaging in that type of trading <u>before</u> the Grahams signed the 2015 agreement. Mascio admitted he sent his confirming email before the Grahams executed the 2015 agreement.** Moreover, Meridian's argument and Mascio's testimony contradict their admissions that the Grahams never authorized this type of risky investment and specifically instructed Mascio not to enter into this type of speculative trade…

> **The undisputed evidence also establishes that Meridian's untrue statement of fact was the proximate cause of the Grahams' losses.** Meridian and Mascio admitted that Interactive

> Brokers liquidated the Grahams' stock portfolio because the VXX transactions they conducted placed the portfolio outside of Interactive Brokers' margin requirements. They also admitted that as a direct result of the VXX transactions, the Grahams' investment portfolio lost cash value of at least $1,070,915.40. **This evidence establishes proximate cause as a matter of law.**

Court of Appeals Opinion, at *9-10 (underline in original; boldface/italics added).

21.     Mascio did not seek further review. The Judgment and Court of Appeals Opinion are final and binding, and as discussed further below, preclude a discharge of the subject debt.

22.     Plaintiffs also brought Mascio's misconduct to the attention of the Washington Department of Financial Institutions ("DFI"). DFI likewise concluded that Mascio had violated WSSA with respect to the Grahams, and banned Mascio from acting as a broker or investment advisor in Washington.

23.     As a result of Mascio's unlawful hiding of assets (discussed below), Plaintiffs have only collected a *de minimis* amount. Meanwhile, post-judgment interest has accrued since 2017. The unpaid amount of the Judgment currently exceeds $2,900.000.00.

24.     Plaintiffs have engaged in extensive collection efforts, including in Colorado where Mascio appears to be domiciled. In order to frustrate collection and conceal his assets, Mascio (both directly, and via business associates and companies he and his associates controlled) provided false, fraudulent and perjurious responses to discovery.

25.     As just a few examples, Mascio and his cronies averred (under penalty of perjury) that Mascio was not working and had no significant sources of income, and that one of his entities, Bertram Global Finance, Inc. ("Bertram") was inactive and being shut down. But, in fact, during this period Mascio was CEO of a combined US-Canadian cannabis enterprise called "Cannabis One" and/or "INDVR", and was being paid a generous salary by Cannabis

11

One/INDVR (which, as discussed below, was being funneled directly to Mascio's bogus "Trust"). And far from being an inactive shell entity, Bertram was, in fact, the primary U.S. entity for the Cannabis One/INDVR business. Due to the fraudulent misrepresentations and omissions made or directed by Mascio, Plaintiffs did not learn about Mascio's substantial income from Cannabis One/INDVR in time to effectively exercise remedies such as garnishment.

. . . .

27.     Mascio has attempted to shield his assets from collection by the Grahams through a variety of illegal schemes. The centerpiece of these schemes is an alleged trust known as the "JG Family Trust" or "Cook Island Trust") (the "Trust").

28.     The Trust is facially invalid for a number of reasons. Most fundamentally, it is a self-settled trust, *i.e.*, Mascio and his wife are both the grantors and beneficiaries. But "a spendthrift trust where the settlor is also a beneficiary cannot 'protect the settlor beneficiary from future creditors.'" . . . .

29.     The Trust is also a sham. "A sham trust is one where the debtor (1) retains too much control over the trust property; (2) ignores legal formalities; and (3) uses the property as his own. When the debtor 'uses the property as his own, the property is treated as owned by the transferor rather than the entity that is the nominal owner.'" *Peters*, 2010 WL 3894035 at *8 (citation omitted). Here, Mascio appears to have unbridled discretion of the use of Trust funds, including adding, withdrawing, and utilizing Trust assets for his own financial convenience. At most, Mascio's crony "Trustees" simply carry out his instructions.

30.     Mascio has also openly admitted that the purpose of the Trust is to insulate Mascio's assets from judgments (as well as other creditors). As Mascio stated in a deposition:

Q. Okay. What was the purpose of this trust?

     A. ***To keep people like the Grahams from filing frivolous lawsuits against their advisor.*** That's the truth.

***

     A. Let's put it this way: ***I'm going to do everything in my power to make sure that the Grahams never get a dime out of me.*** If it requires me to file for bankruptcy, I will do that.

***

Q. That was very fashionable for a while. You don't see the Cook Islands that much anymore.

A. It got expensive, so that's the reason. So maintaining it and dealing with it is expensive. But *when you get people that think they can go run down to court and get some clown judge in Washington to award them 1 million 5 when they don't deserve it, it serves its purpose.* That's the way I see it.

***

Q. Right. So when you say that you don't own any real property, you mean it.

A. I mean it. I mean, I own nothing.

***

Q. Would your wife file [for bankruptcy] also?

A. No. I mean, she's as much broke as I am, by design.

31.    In yet another one of his fraudulent attempts to evade collection, Mascio testified at his deposition that the Trust had not received any assets since he deeded his house to the Trust in 2005:

> I know exactly how it works. So, for instance, let's say we win on appeal and the whole thing's tossed. Magically, I'm all of a sudden back in the same place as I was in before. And if you bring a claim against me again, strange, I'm no longer a beneficiary. That's pretty much the way it works. So there's no possibility of having a claim against me  and being able to touch the trust. So all fraudulent conveyance is gone because it's been established since 2005, and *there hasn't been anything transferred into it since*, and everything's been established in the trust if it was ever established in the first place.

(emphasis added). But this was yet another lie (and perjury) from Mascio.  In fact, Mascio and his family have moved massive amounts of stock, money, and likely other assets into the Trust, with no equivalent value received in return.

32.    . . . "[w]hile Mascio was CEO of INDVR, he would also direct that INDVR placed his salary and equity into the Trust,

rather than his personal account, in an obvious attempt to get around his obligation to pay the Grahams." Case No. 25-10631-TBM, Dkt. # 20, p.9. According to INDVR's securities filings, Mascio's cash salary was $26,000 (Canadian) per month, and $312,000 (Canadian) over just one 12-month period . . . . [S]ubstantial stock in INDVR was issued to the Trust.

33.     In addition, in its own litigation against Mascio, INDVR also established that Mascio also covertly funneled additional moneys to the Trust during recent years, including from the "Cannabis Corp." entity owned and operated by Mascio and his wife.

34.     Moreover, Mascio's own bankruptcy schedules confirm that the Mascio has funneled still more money into the trust via bogus "rent" payments for the family residence. Mascio's disclosures in his now-dismissed 2024 bankruptcy indicate that Mascio paid the Trust at least $15,000 per month—an amount conveniently corresponding to the Mascios' entire declared income at the time—in "rent" for the house. This astronomical "rent" payment was for a home valued at a little over $1 million, which would fetch only a small portion of that "rent" figure on the open market. Yet now, according to his documents filed in the present bankruptcy, and at a time when he reports having no income, Mascio supposedly pays no rent to the Trust, but instead directly pays the mortgage payment of about $3,500 per month. Case No. 25-10631-TBM, Dkt. Nos. 1 and 29. Obviously, no arm's length lease would have basic terms fluctuate so wildly. In other words, the purported "rent" payments were simply a smokescreen for Mascio to move money into the Trust (and supposedly out of the reach of creditors) in whatever amounts he sees fit.

35.     Mascio's bankruptcy filings contain numerous troubling omissions, inconsistent and misstatements—in other words, Mascio is not only misleading his creditors and the Trustee, but is also misleading the Court.

36.     For example, Mascio failed to disclose any of the assets owned by the Trust (other than mentioning that he "rents" his home from the Trust. While Mascio apparently claims that Trust assets are exempt under 11 § 541(c)(2), that claim is frivolous. "In Colorado, only trusts enforceable under state law as spendthrift trusts fall within the [§ 541(c)(2)] exception and are excluded from the assets of a bankruptcy estate… If

'trusts are shams or otherwise void under Colorado law the trust property is includable in the bankruptcy estate.'" . . . .  the Trust is facially invalid.

37.     There are also unexplained inconsistencies between Mascio's disclosures in his 2024 bankruptcy versus his present bankruptcy, including as to Mascio's income. For instance, in his 2024 bankruptcy, Mascio stated that his income for calendar year 2023 was $158,000.  But in his current bankruptcy schedules, Mascio's income for the same calendar year (2023) is now reported as being only $100,000, with no explanation as to the change.

38.     Similar inconsistencies exist with respect to Mascio's purported liabilities, including without limitation the markedly different treatment of Mascio's payment of "rent" and/or mortgage payments for his home.

39.     Mascio's contention that he owns no personal property of any significant value is also highly suspect.  Mascio and his wife had substantial incomes for a number of years, and they also report high balances on credit facilities (*e.g.*, Apple and Best Buy credit cards).  That money was obviously used to purchase something, but where it went is not explained by Mascio's filings.  In short, Mascio likely spent substantial funds on personal property which Mascio has failed to disclose.  (As noted above, even if Mascio purported to move personal property into the bogus Trust, § 541(c)(2) does not shield that property from either disclosure or turnover).
. . . .

43.     . . . Mascio is bound by the Judgment and Court of Appeals Opinion, which concluded he engaged in misconduct subject to §523(a)(2)(A).

44.     . . . the Judgment and Court of Appeals Opinion expressly found that Mascio violated RCW 21.20.010, the provision of WSSA pertaining specifically to fraud, deceit, and false and misleading representations.  Those findings are binding on Mascio and squarely meet the requirements for an exception to discharge under § 523(a)(2)(A) – *e.g.*, Mascio's deliberately false assurances that he would not be venturing into high risk high-speculation markets were a "false pretense," "false representation," and "actual fraud," on which Plaintiffs reasonably and detrimentally relied . . . .

15

45.    Finally, Mascio compounded his underlying securities fraud by making and/or directing others to make false, fraudulent and perjurious representations as to Mascio's financial condition, including in Mascio's deposition, Mascio's responses to post- judgment discovery, and subpoena responses submitted by Mascio's cronies. For example, Mascio lied about and concealed his business activity and income derived from Cannabis One/INDVR, thereby preventing timely collection efforts such as garnishment of Mascio's earnings.
. . . .

48.    As Plaintiff's investment advisor, with authority to trade on Plaintiffs' account, Mascio was a fiduciary.

49.    . . . Mascio engaged in fraudulent conduct with respect to his fiduciaries, Plaintiffs.

50.    Mascio's conduct constitutes "defalcation." . . . Here, too, Mascio failed to follow the directives of his fiduciaries, including their instructions regarding risk tolerance and express prohibition on further transactions involving VXX. Mascio's defalcation was further motivated by Mascio's self-interest, i.e., his desire to obtain performance-based compensation for himself.
. . . .

57.    Mascio has, within one year of filing the subject petition, made fraudulent transfers to hinder, delay, or defraud creditors (including Plaintiffs).  Such fraudulent transfers include, without limitation, his payment of inflated "rent" and other transfers into the Trust.
. . . .

66.    . . . Mascio has withheld records, including but not limited to the records which the Court ordered produced in its Order of February 28, 2025.  And again, given that Mascio's entire reported financial condition is a lie, it necessarily follows that Mascio has, and will continue to, fail to provide full and accurate financial records.

67.    Mascio has, and will continue to, fail to explain the loss of assets, including without limitation, assets he has illicitly moved into the Trust.

As noted previously, when considering a motion to dismiss under Fed R. Civ. P.

16

12(b)(6), the Court must accept as true all well-pleaded factual allegations in a complaint and view them in the light most favorable to the plaintiff. *Burnett*, 706 F.3d at 1235.

## VI.    Legal Analysis.

### A.    The Debtor's Motion to Strike is Meritless and has been Withdrawn.

The Debtor initially requested that the Court strike the Complaint and papers filed by the Grahams' counsel ("Counsel"). The Debtor asserted *without any factual basis* that Counsel was not admitted to practice in the District of Colorado. In the Opposition, Counsel met the Debtor's argument head on with his "Declaration of R. Omar Riojas In Support of Plaintiffs' Opposition" (Docket No. 7-1, the "Declaration"). Counsel attached evidence to the Declaration showing that he is admitted to practice in the District Court and therefore, in this Court. It demonstrates that Counsel is admitted and in "Good Standing" and has been admitted since February 1, 2017.

In his Reply, the Debtor refers to the Declaration and attachment as "newly disclosed information, which had it been included with the Complaint. . . would have eliminated any need to challenge Mr. Riojas' authority." Reply, at 2. As such, the Debtor "withdraws the motion to strike *only* on the basis of the attorney's admission status." *Id*.

Despite the Debtor's withdrawal, the Court addresses the Motion to Strike. The information provided on the District Court's webpage does not amount to "newly disclosed information." It is publicly available and shows that Counsel is in good standing in the District Court and was admitted in 2017. As such, the Debtor purported excuse for his unfounded position rings hollow. The Debtor just advanced an objective falsehood with no basis . Furthermore, an attorney's admission status has no bearing on a Rule 12(b)(6) motion.

### B.    The Complaint Contains Sufficient Factual Allegations to State Claims for Relief under Sections 727 and 523.

In the Motion to Dismiss, the Debtor argued that the Complaint should be dismissed for failure to state a claim under Fed. R. Civ. P. 12(b)(6) as made applicable to this Adversary Proceeding by Fed. R. Bankr. P. 7012 because: (1) the Judgment "is dormant and unenforceable in Colorado; (2) since the Judgment is unenforceable, it "may not be a basis for a nondischargeability action [under Section 523(a)(2), (4), and (6)] where no new fraud or willful conduct is pled;" and (3) the Grahams have failed to plead specific facts showing the Debtor's fraudulent intent or concealment of assets. The Debtor's Fed. R. Civ. P. 12(b)(6) argument is totally generic and undeveloped.

With respect to the Debtor's argument about the enforceability of the Judgment, such argument is inappropriate at Fed. R. Civ. P. 12(b)(6) Motion to Dismiss stage for multiple reasons. First, the Debtor invites the Court to look outside the "four corners" of

the Complaint in respect to revival of the Judgment.  But that is impermissible.
*Howsam*, 261 F.3d at 961 (generally "unacceptable for a court" to look "beyond the four corners of the complaint" when deciding a "Rule 12(b)(6) motion to dismiss").  And, besides, the Debtor has not presented any admissible evidence on the issue.  Second, the Debtor's contention that the Judgment is unenforceable by reason of the lapse of time sounds as an affirmative defense which may be raised in the Debtor's answer and litigated on the merits.  *See Midland Funding, LLC v. Johnson*, 581 U.S. 224, 230 (2017) ("the running of a statute of limitation's period constitutes an affirmative defense").  For example, in *Malherbe v. Oscar Gruss & Son, Inc.*, 2023 WL 199425 (S.D.N.Y. Jan. 17, 2023), the defendant moved to dismiss a complaint under Fed. R. Civ. P. 12(b)(6) claiming that underlying German judgments were invalid and unenforceable.  The Court rejected the argument and ruled:

> These arguments are prematurely raised in support of a motion to dismiss [under Fed. R. Civ. P. 12(b)(6)].  Plaintiff has no burden at this stage other than to plead that the underlying judgment is final, conclusive, and enforceable, which it has done.  Proving one or multiple grounds for non-recognition is the burden of the Defendant, and one which can be satisfied only at later stages of the proceedings, once raised an affirmative defense  . . . .

*Id*. at *3.  The Court concurs.  Finally, the Debtor's citation is COLO. REV. STAT. § 13-52-102(1) for the proposition that "judgments become unenforceable in Colorado after six years" misapprehends the nature of execution on judgments in Colorado.  COLO. REV. STAT. § 13-52-102(1) deals with the expiration of judgment *liens*, not the enforceability of judgments.  The Complaint neither alleges the existence of a judgment lien nor does it rely upon one in support of the claims for relief.  In any event, COLO. REV. STAT. § 13-52-102(2)(a) establishes the general rule with respect to enforceability of judgments:  ". . . execution may issue on any judgment . . . to enforce the same at any time within twenty years from the entry thereof, but not afterwards, unless revived as provided by law . . . ."  As the Colorado Supreme Court explained COLO. REV. STAT. § 13-52-102(1) as follows:

> [a] party may not obtain payment of a debt through execution on a judgment lien after the six-year limitations period has passed unless the judgment is revived . . . .  The six-year limitations period runs from the date of judgment, not the date the judgment is filed in Colorado.  *Baum v. Baum,* 820 P.2d 1122, 1123 (Colo.App.1991).  *The running of the statute of limitations governing collection of payment of the debt through execution on the judgment lien, however, does not extinguish the debt. See Estate of Ramsey v. State Dep't of Revenue,* 42 Colo. App. 163, 591 P.2d 591, 595 (1979).

*Mortg. Invs. Corp. v. Battle Mountain Corp.*, 70 P.3d 1176, 1186 (Colo. 2003) (emphasis added); *see also Wells Fargo Bank, N.A. v. Kopfman*, 226 P.3d 1068, 1071 (Colo. 2010) ("While judgments in Colorado last for twenty years, judgment liens expire six years after entry of judgment."). So, the argument raised in the Motion to Dismiss pertaining to enforceability of the Judgment, does not support dismissal at this stage.

However, the Court delves just a bit deeper. In the Complaint, the Plaintiffs asserted four claims for denial of discharge — under Sections 727(a)(2), (a)(3), (a)(4)(A) and (a)(5). Those provisions state:

> The court shall grant the debtor a discharge, unless—
> . . .
>
> (2)    the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—
>
> > (A)    property of the debtor, within one year before the date of the filing of the petition; or
> >
> > (B)    property of the estate, after the date of the filing of the petition;
>
> (3)    the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all the circumstances of the case;
>
> (4)    the debtor knowingly and fraudulently, in or in connection with the case —
>
> > (A)    made a false oath or account. . . ;
>
> (5)    the debtor has failed to explain satisfactorily . . . any loss of assets to meet the debtor's liabilities. . . .

11 U.S.C. §§ 727(a)(2), (a)(3),(a)(4)(A) and (a)(5). Put another way, "[t]he debtor must deal fairly with creditors and with the court. This obligation is imposed indirectly through a series of objections to discharge set out in Code § 727(a). Thus, § 727(a) provides a mechanism for proof of certain conduct by a debtor that may result in a denial of discharge." *In re Gordon*, 526 B.R. 376, 387-88 (10th Cir. BAP 2015).

The Plaintiffs' Section 727(a) claims are centered both on the many findings of fact rendered by the Washington State Court in the Judgment in support of its conclusion that the Debtor had engaged in securities fraud as against the Grahams. Then, there are multiple allegations that the Debtor has failed to be forthright in his bankruptcy filing as to the nature, extent and whereabouts of his assets. The Grahams allege that in response to their efforts to collect on the Judgment, "Mascio (both directly, and via business associates and companies he and his associates controlled) provided false, fraudulent and perjurious responses to [Rule 69] discovery." Compl. ¶ 24. They allege efforts by the Debtor to conceal his "generous salary by Cannabis One/INDVR (which . . . was being funneled directly to Mascio's bogus 'Trust'." *Id.* ¶ 25. They further allege the Debtor engaged in "fraudulent asset protection schemes," primarily involving the Trust. The Grahams  contend that the Debtor "has funneled still more money into the trust via bogus 'rent' payments for the family residence." *Id.* ¶ 34. The assert there are discrepancies in the amount of rent paid to the Trust between the Schedules the Debtor filed in his First Case and those in the Main Case. And the discrepancies have gone unexplained. *Id.*  The Grahams also contend there are "Irregularities with Mascio's Current and Prior Bankruptcy Disclosures"  *Id.* ¶¶ 35-39.

As noted earlier, a proper complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Iqbal*, 556 U.S. at 678.  A claim is considered "plausible" when the complaint contains facts which allow the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  Ultimately, the critical question is: "assum[ing] the truth of all well-pleaded facts . . . and draw[ing] all reasonable inferences therefrom in the light most favorable to the plaintiffs," whether the complaint "raise[s] a right to relief above the speculative level.'"  *Dias*, 567 F.3d at 1178.  It is a very low threshold.

The Court determines that the Plaintiffs have passed the very low Fed. R. Civ. P. 12(b)(6) dismissal threshold with respect to their claims under Sections 727(a)(2), (a)(3), (a)(4)(A) and (5).  The Debtor plainly is on notice of the factual basis for the claims: that he has engaged in securities fraud against the Grahams, that he allegedly concealed assets and transfers to the Trust, that he engaged in fraudulent schemes to evade paying the Judgment, including funneling various assets to the Trust, not providing adequate information about the Trust, including the purported "rent" payments and then not explaining the differences in assets and liabilities between the First Case and his current Main Case.  Again, "granting [a] motion to dismiss is a harsh remedy which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but also to protect the interests of justice."  *Dias*, 567 F.3d at 1178.  Thus, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'"  *Twombly*, 550 U.S. at 556.

In addition to the Section 727(a) claims, the Plaintiffs also asserted three claims for relief seeking a determination that the Judgment is nondischargeable:  Sections 523(a)(2), (4) and (a)(6).  Those provisions state:

(a)     A discharge under section 727 , , ,, does not discharge an individual debtor from any debt  —

. . . .

(2)       for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by —

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

(B) use of a statement in writing—
(i) that is materially false;
(ii) respecting the debtor's or an insider's financial condition;
(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
(iv) that the debtor caused to be made or published with intent to deceive . . .

. . . .

(4)       for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;

. . . .

(6)       for willful and malicious injury by the debtor to another entity or to the property of another entity . . . .

The Section 523(a) claims are premised upon the debt established in the Judgment. Although the Grahams do not attach the Judgment, they recite many of the significant and relevant findings.  And, the Debtor does not dispute the existence of the Judgment. The Washington State Court found the Debtor violated Washington securities laws in his dealings with the Grahams having made false and fraudulent representations to them. Compl. ¶12.  The Washington State Court awarded the Grahams monetary damages in the amount of $1,513,426.83, plus post judgment interest accruing at 12% per annum.  *Id*. ¶ 19.  Coupled with the many other factual allegations set forth in the Complaint, the foregoing is more than enough to state plausible claims for nondischargeability under Sections 523(a)(2), (a)(4) and (a)(6).  Therefore, dismissal under Section 12(b)(6) is not warranted.

**C.**     **The Complaint Should Not be Dismissed for Failure to Plead Fraud with Particularity.**

In the Motion to Dismiss, the Debtor argued:

> Plaintiffs rely on conclusory allegations regarding a valid offshore trust and fail to allege specific misconduct or concealment within one year of the bankruptcy filing sufficient to meet the heightened pleading standard.  See Fed. R. Bankr. P. 7009; Fed. R. Civ. P. 9(b).  The Complaint fails to allege any new fraudulent conduct by the Defendant within the statutory period that would support a claim under 11 U.S.C. §§ 523 or 727.  The pleading relies heavily on conclusory allegations without specific factual support, fails to meet the specificity requirements established by Rule 8(a) and Rule 9(b) of the Federal Rules of Civil Procedure, as incorporated by Bankruptcy Rule 7008 and 7009.

(Docket No. 6 at 2.)

The Debtor's foregoing Fed. R. Civ. P. 9(b) argument is totally generic and undeveloped.  The Debtor also did not tie his position to any specific claims or elements of claims.  Accordingly, the Debtor has functionally waived such argument.

However, the Court considers the issue further.  All of the claims advanced by the Plaintiffs (under both Sections 727(a) and 523(a)) are based on forms of alleged fraud.  So, the Plaintiffs were obligated to plead fraud with particularity under Fed. R. Civ. P. 9(b).  The Court assesses that the Plaintiffs met that standard at the motion to dismiss stage.  The core requirement of Fed. R. Civ. P. 9(b) is that "the circumstances of the fraud be pled with enough specificity to put defendants on notice as to the nature of the claim."  *St. Mark's Hosp.*, 895 F.3d at 745.  The Complaint (coupled with the referenced Judgment) is more than enough to put the Debtor on notice of the nature of the claims.

In any event, the Debtor appears to misapprehend the nature of a complaint and an initial motion to dismiss.  The Complaint does not need to include all of the Plaintiffs' documentary evidence.  Evidence is presented at trial; and the Debtor will have an opportunity to contest it then and there.  Meanwhile, the Debtor's challenges to the enforceability of the Judgment and its impact on the Section 523 and 727 claims for relief are misplaced and not a basis for dismissal of the Complaint.

### VII.   Admonition to the Debtor.

The Debtor appears to have elected to proceed in this case without counsel. He may do so, but he is admonished that he will be held to the same standards as parties who appear with counsel.  He has already engaged in improper conduct in advancing an objectively false argument about opposing counsel and citation of a fake case:  *In re Simpson*, 2008 WL 467698 (Bankr. D. Kan. 2008).  Such case does not exist.  Instead, the decision located at 2008 WL 467698 is, *Roby v. American Airlines, Inc.*, 2008 WL 467698 (9th Cir. 2008), an opinion which has no bearing on this case.  The Debtor states the incorrect citation was an error, but he is

cautioned that he, like all the attorneys who appear in this Court, are subject to all the requirements of Fed. R. Bankr. P. 9011.  If the Debtor is using artificial intelligence, the Debtor is cautioned that the use of artificial intelligence for research whether by attorneys or pro se parties is subject to Rule 11 compliance and the failure to ensure a citation is existent and stands for the proposition for which it is cited may be sanctionable.  *See Coomer v. Lindell*, 2025 WL 1865282, at *3 and *8 (D. Colo. Jul. 7, 2025).

## VIII.   <u>Conclusion and Order</u>.

For the foregoing reasons, the Court DENIES the Motion to Dismiss.

The Court FURTHER ORDERS that the Debtor shall file a responsive pleading to the Complaint within 14 days of the entry of this Order as provided for by Fed. R. Bankr. P. 7012(a).

DATED this 22nd day of August, 2025.

BY THE COURT:

Thomas B. McNamara,
United States Bankruptcy Judge

23